Atkinson, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
The claimant entered into a contract with the United States for dredging earth and rock and constructing jetties in James Eiver, Ya. A copy of the contract and specifications forming part thereof are attached to the petition as Exhibit A.
The description of the work to be done was stated in paragraphs 18, 19, and 20 of the specifications as follows:
“ 18. Work to be done: The work to be done under these specifications consists in excavating and removing material from portions of the channel of the James Eiver; towing the material and disposing of it by casting it overboard, conveying it ashore, or dumping it; constructing pile jetties; revetting dikes and jetties with excavated material; and removing old wharf piles.
*169 “CHANNEL excavation.
“ 19. Localities: Channel excavation is to be carried on in the three following divisions of the river, in which it is proposed to secure a depth of 18 feet below mean low water:
“ Division 1, extending from Jetty B, about 800 feet below the lower city line of Eichmond, Va., to Jetty 28, about 8,300 feet below that line.
“ Division 2, extending from Jetty 41 to Jetty 49, about 2-| miles below the city line of Eichmond.
“ Division 3, situated in Kingsland Eeach, about 10 miles below Eichmond.
“20. Nature of work: In division 1 the work will consist in widening the channel 50 feet or more over a length of about 7,500 feet to the full projected width of 200 feet. In division 2 lumps in the channel are to be removed over a distance of about 1,600 feet so as to obtain the channel width of 200 feet. In division 3 the work will consist in excavating a channel 200 feet wide over a distance of about 2,600 feet.”
By paragraph 31 it was declared that material excavated from a greater depth than 1 foot below the prescribed depth of 18 feet or from outside the limits of the channel as marked by stakes and ranges will not be paid for, due allowance, however, being made for slide slopes.
The disposition of excavated material was to be made under instructions of the engineer, and no question is raised on that feature. The provisions of the specifications relative to conveying material ashore, dumping material, and transporting material appear in paragraphs 34, 35, and 36. as follows:
“ 34. Conveying material ashore: The price paid for conveying material, as described under subhead (2) of the preceding paragraph, will cover the cost of all plant and appliances used-for and incidental to said conveying, and all labor and other expense incurred in placing and disposing of the excavated material by this method. It is estimated that the quantity of material to be conveyed will be about 31,000 cubic yards, and that it will have to be conveyed an average distance of about 180 feet. It is not expected that the above quantity will be increased or diminished more than 50 per cent.
“ 35. Dumping material: It is estimated that about 35,000 cubic yards of material will be transported about 30 miles on dump scows to the vicinity of Jordans Point and dumped. This quantity may be increased or diminished as the exigencies of the work may require, although it is not expected that *170 the variation from the estimated quantity will be more than 50 per cent.
“ 36. Transporting excavated material: The prices bid for both earth and hard rock excavation will include the cost of transporting on scows the material between the extreme head of the work at Jetty B and Jetty No. 134, 6| miles below. An additional price to be named in the bid will be paid the contractor for transporting this material (which does not include that to be dumped near Jordans Point) below Jetty No. 134. It is estimated that the quantity of material to be so transported will be about 22,000 cubic yards (subject to a variation of 30 per cent) and that it will have to be carried on deck scows an average distance of 4 miles below Jetty 134.”
By the contract between the parties the specifications are made a part of it, and it is agreed—
“(a) The said party of the second part shall furnish all necessary material, labor, machinery, and appliances, and dredge earth and rock, construct jetties, and remove piles in James Biver at the following prices:
“For earth excavation, 133,400 cubic yards, more or less, at 37-^¶ cents per cubic yard.
“For hard rock excavation, 5,750 cubic yards, more or less, at $11.10 per cubic yard.
“For conveying excavated material from scows to points of deposit, as specified in paragraph 34 of the specifications, 31,000 cubic yards, more or less, at 27 cents per cubic yard.
“For transporting excavated material on deck scows below Jetty No. 134, as specified in paragraph 36 of the specifications, 22,000 cubic yards, more or less, at 15 cents per cubic yard.
“For dumping excavated material in vicinity of Jordans Point, as specified in paragraph 35 of the specifications, 35,000 cubic yards, more or less, at 22^ cents per cubic yard.”
The claimant proceeded with his work under the said contract, which required its completion within two years; that is, by November 14,1909. Finding that the work would not be completed by said date, the claimant, on October 21, 1909, made an application in writing for an extension of time to January 14,1910, stating some reasons for the application, and saying:
“And for the reasons above stated would respectfully request that this extension be granted without charges against us for superintendence and inspection.”
*171 The reply to said application stated that the extension was “ granted by the Chief of Engineers, United States Army, under provisions of paragraph 5 of the contract,” and added:
“ These provisions provide that all expenses for superintendence and inspection and all other actual losses and damages to the United States due to the delay will be deducted from any payments due or to become due to you.”
The claimant acknowledged receipt of said communication.
Again, on December 15, claimant applied for a further extension of two months from January 14 to March 14, 1910, which application was replied to by Maj. Morrow, of the Corps of Engineers, on December 21, stating that he was authorized by the Chief of Engineers, United States Army, “ to grant you an extension of time for a reasonable period, you to bear the necessary costs of inspection and superintendence.” The receipt of this reply to his application was at once acknowledged by claimant.
Paragraph 5 of the contract provided that an extension of time could be granted by the Chief of Engineers, and—
“ Should the original time limit be thus waived, all expenses for inspection and superintendence and all other actual losses and damages to the United States due to the delay beyond the time originally set for completion shall be determined by the party of the first part and deducted from any payments due or to become due the party of the second part.”
The cost of superintendence and inspection incurred by the United States during the periods of the two extensions was deducted from time to time from the payments made to the claimant and aggregated $1,616.
It is to recover these deductions for the cost of inspection and superintendence that this action is brought. No question is made as to the correctness of the amounts of said items of cost. The work was completed and paid for in the sum of $176,604.98, less said item of $1,616.
The contention of the claimant is that the contract provided by the provisions above quoted for excavating, conveying, transporting, and dumping material of so many cubic yards “ more or less ” at stated prices; that before the end of *172 the contract period he had conveyed and dumped at least 10 per cent more than the stated amounts of each kind at the designated places; and that therefore he could not be properly charged with the cost of superintendence and inspection while performing what he contends is additional work to that contracted to be done. He contends that, notwithstanding the terms of the specification (secs. 34, 35, and 36) above quoted, the contract specifies amounts “more or less” and that these are controlling.
The claimant’s contentions are not tenable.
This court said in New Jersey Foundry & Machine Co. case, 44 C. Cls., 570, 580:
“ It is doubtless true that where there is an inconsistency in the provisions of the contract and the provision of the specifications, the positive language of the contract should prevail.”
But it was also said in that case to be “ equally well settled that all parts of a contract will be construed in such a way as to give force and validity to all of them and to all the language used when that is possible.”
While both of said rules may be applied here with the same effect as they were applied in said case, it is not necessary to decide that every conflict between the terms of a contract and the specifications made a part of it must be resolved in favor of the contract. In view of the requirement of the statute that certain contracts be let after public advertisement for proposals to be based upon plans and specifications it is not here conceded that a contract which would so materially contradict the terms of the specification as to defeat the purpose of said statute would be given effect. As stated, the contract and specification in this case must be ' construed together, and so construed we find no conflict between them.
It is true that the contract uses the phrase “ more or less,” and the claimant citing Hardy's case, 9 C. Cls., 244, insists that the exact number of cubic yards to be transported “ is qualified, by the words £ more or less ’ employed in the contract and may be slightly varied by either party without infringing his obligation or in any way defeating the actual intent and meaning of the contract.” (Italics ours.) We are also referred to Brawley's case, 96 U. S., 168.
*173 More to the point, it seems to us, than the above quotation from Hardy’s case, is the court’s statement in that case that the words “ more or less ” used in a contract have by usage no technical meaning “ and must always be so understood as to effectuate the immediate intention of the contracting parties” (p. 251).
In Brawley’s case, supra, the Supreme Court distinguishes the use of said phrase in contracts “ to sell or furnish certain goods indentified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse or all that may be manufactured by the vendor ”; and in contracts where no such independent circumstances are referred to and the engagement is to furnish goods of a certain quality or. character to a certain amount the quantity specified is material. In the latter case, the words “ more or less ” are said to be used for the purpose of providing against accidental variations. “ If, however,” says the court, “ the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significancy, then the contract is to be governed by such added stipulations or conditions.”
In Moore’s case, 196 U. S., 157, the court held that where a contract obligated the United States to receive “ about 5,000 tons of coal ” and there had been delivered 4,634 tons, the Government could not refuse to accept 366 additional tons tendered to complete the delivery of the 5,000 tons, upon the ground that they had received “ about ” 5,000 tons when they accepted the 4,634 tons. The difference was declared to be too great, and the Brawley case is followed.
We do not, however, have to decide the question that might be presented if the words “ more or less ” stood alone in the contract. The claimant’s proposals to do the work were based upon the specifications, and the agreement between the parties, when the bid was accepted, was to be reduced to writing. The intention- of the parties was by their contract to reduce to writing the agreement at which they had arrived, by the bid and its acceptance, and was not to make a materially different agreement. They therefore carried into the written .contract, by reference, the terms of *174 the specifications as to the quantities of excavated materials and the transporting and dumping of such materials. The entire contract thus made must be considered and not merely separate portions of it. Every part of a contract must be construed in its proper relation to other parts of it, and a construction that will uphold it as an entirety is preferable to one that strikes down parts of it, if the intention of the parties can be ascertained and effectuated. Reading the provisions of the specifications in connection with the contract it is readily seen that the phrase “more or less” as there used comes within the first class of cases mentioned in Brawley's case rather than in the latter class referred to ■therein. The estimates in the specifications must be given some effect. That such was the intention is made apparent by paragraph 7 of the contract, providing that “no claim whatever shall at any time be made upon the United States by the party of the second part for or on account of any extra work,” etc., because if claimant’s contention here prevailed no effect could be given to said paragraph.
The work which claimant bid upon was the excavating and removing of materials from portions of the James River. He was informed by the specification that the purpose of the excavation was to secure a depth of 18 feet in said river below mean low water in three divisions of the work and a channel width of 200 feet. It was declared (par. 31) that material excavated from a greater depth than “ 1 foot below the prescribed depth of 18 feet” or from outside the limits of the channel as marked would not be paid for. These provisions, in connection with the others mentioned, show conclusively that it was not the purpose or intention of the parties that the quantities mentioned in the contract should be controlling, with a slight variation allowed for “ more or less.”
The practical construction given by the parties to said provisions confirms our conclusion. The claimant, requesting an extension, asked to be relieved of the cost of superintendence and inspection, and accepted without question the extension that was granted when told in the letters authorizing it that he would be required to defray said costs. *175 When he applied for the extension he thought the contract bound him to pay said costs. We still think so. District of Columbia v. Gallaher, 124 U. S., 505; Topliff v. Topliff, 122 U. S., 121.
The petition should be dismissed, and it is so ordered.
All concur.