## LOFTIS v. UNITED STATES.
### No. 46078.

Court of Claims.
April 5, 1948.

N. A. Townsend, of Washington, D. C. (Gardner, Morrison & Rogers, of Washington, D. C., on the brief), for plaintiff.

Brice Toole, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, HOWELL, MADDEN, and WHITAKER, Judges.

LITTLETON, Judge.

Plaintiff brought this suit under a unit price contract with defendant to recover additional compensation in the total amount of $904,390.98 which he alleges became due him under the terms of the equitable adjustment provisions of Article 4 of the contract, quoted in finding 21. It is claimed that this amount, computed at $1.50 per cubic yard as a fair price for certain excavation, less 37 cents per cubic yard paid, should be allowed by reason of unknown and latent subsurface conditions encountered during performance of the contract

which necessitated a large amount of additional and more expensive work of excavating and rehandling, upon written order of defendant, 800,346 cubic yards of subsurface wet and muck materials. It is insisted that this work of excavating subsurface materials of the character and in the amount encountered was not contemplated by the contract nor included in the original contract unit price of 37 cents per cubic yard for the excavation indicated and called for in the specifications and drawings; that an examination and investigation of conditions at the site did not disclose that any such excavation would be necessary or that the unstable subsurface conditions subsequently encountered existed; that the subsurface conditions discovered were unknown conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in embankment fill construction work of the character provided for in the plans and specifications; that the conditions encountered could not reasonably be anticipated or foreseen from a thorough examination of the site, and were not discovered by the best investigation of the conditions at the site, which it was possible to make with the facilities available and within the time allowed prior to the submission of bids.

Defendant denies that "Changed conditions," within the meaning of Article 4, were encountered and has also filed a counterclaim for certain alleged excess excavation allowances and overpayments at the contract rate.

On September 1, 1942, defendant issued an invitation for unit price bids to be submitted by September 7, 1942, on the basis of written specifications, drawings and the standard Government form of construction contract, without the standard provision for "Liquidated damages." Plaintiff's bid, submitted September 6, was accepted. On the following day, the contract was awarded to plaintiff and the standard contract dated September 7, 1942, was executed by the parties. The contract, in Article 1, made the specifications and drawings a part thereof but such documents became a part of the contract subject to the express provi-

sions in the several articles of such contract. Plaintiff commenced work September 10, 1942.

The work called for by the contract documents consisted of the enlargement of the existing airfield at the Charleston Bomber Command Station, located about ten miles northwest of Charleston, South Carolina, by extending each of the three existing runways a distance of 2,500 feet and the construction of embankment fills for such runways and, also, for certain additional taxiways and hardstand parking areas.

As shown in the specifications and indicated on the drawings, this work involved certain clearing and grubbing, grading excavation, borrow excavation, construction of embankment fills, paving and the construction of miscellaneous buildings.

The main question in the case concerning "Changed conditions" first arose about October 27, 1942, in connection with the grading excavation and constructing embankment fills for the NE-SW runway extension and taxiway 5. Subsurface excavation in other construction areas is also involved in the claim, but the subsurface conditions encountered in the NE-SW runway and taxiways 1 and 5, will be first discussed.

The other questions in the case relate, first, to the finality of the decisions of the contracting officer and the Board of Contract Appeals, representing the Secretary of War, which held "Changed conditions" within the meaning of Article 4 had not been encountered, second, to a fair price for the additional work, and third, to the three items of the counterclaim.

The quantities and character of the subsurface materials excavated and rehandled were not in dispute before the contracting officer and the Board of Contract Appeals, and are not in dispute here except as to an amount of 180,288 cubic yards involved in one item of defendant's counterclaim.

Near the conclusion of the work the contracting officer had a determination made by several of his engineers in cooperation with plaintiff and his engineers of the quantities of subsurface materials excavated and rehandled, which he approved for the purpose of payment. He also made decisions,

on the basis of which he made payments, of the amounts of excavation (not relating to the "Changed conditions") involved in the other two items of the counterclaim. The contract made the contracting officer's decisions conclusive as to questions of fact and this included decisions as to quantities, and defendant's proof in support of its counterclaim is not sufficient to show that any of the decisions so made were erroneous.

The information shown in the specifications, the pertinent provisions of which are set forth in findings 17-20, and indicated on the drawings or plans, was based on surface conditions and measurements in the several new construction areas, and such specifications and drawings contained no representation or information relative to, or concerning the nature or character of subsurface conditions, nor did they disclose or indicate that it was believed or suspected that there existed any unstable subsurface conditions that would or might require subsurface excavation beyond draining and clearing the surfaces of certain pools of water, the surface debris and decayed vegetation in the embankment construction areas. The defendant had made no subsurface examinations or explorations in any of the construction areas, except at one point near station 50 where the original NE-SW runway ended, but this point was not within the so-called strip mine area. That boring had been made, in connection with drainage, soon after the completion of the original airfield, but it disclosed a firm and impervious subsurface of gumbo material. Therefore, defendant's engineers and contracting officers, who made the surveys and prepared the specifications and plans for the new construction work, were not in possession of any information and did not possess knowledge of any facts concerning the character or quality of the subsurface materials and conditions in the strip mine section of the construction areas of the NE-SW runway extension and taxiways 1 and 5, where plaintiff encountered unforeseen and unstable subsurface conditions after considerable excavation and embankment construction work had been performed.

By reason of the subsurface conditions encountered in these areas it was necessary for plaintiff to excavate and rehandle, pursuant to a written order finding changed conditions, approximately twenty-four times the total amount of excavation estimated by defendant in such areas as indicated on the plans and as estimated by plaintiff after his investigations of the ground conditions. The fair and reasonable price for the excavation of the subsurface material encountered in the NE-SW runway and taxiways 1 and 5 is shown by the evidence to have been more than four times the contract unit price of 37 cents per cubic yard for the 27,-215 cubic yards of general excavation shown in such areas, which was referred to in the specifications as "unclassified excavation." The total amount of "unclassified excavation" estimated in the specifications for the entire job was approximately 100,-000 cubic yards, and the total estimated amount of excavated and borrow material required for constructing fills was shown as approximately 669,115 cubic yards.

On September 1, 1942, plaintiff and his engineer-superintendent, together with the representatives of two other bidders, visited the site of the proposed work, in company with an engineer of the District Engineer's office. The bidders examined the site and investigated the conditions thereof. The examinations and investigations made were for the purpose of estimating the time required and the cost of performance of the several items of work specified and called for, and were more thorough than any examination that had previously been made by any of the defendant's engineers.

Plaintiff, an experienced contractor, went upon and viewed the site and the surface conditions thereof, and his engineer with the representatives of other bidders walked over the construction areas and examined and investigated the conditions thereof as best they could under the circumstances and within the time available. In addition to examining the existing surface conditions, plaintiff's engineer, who had had twenty-two years' experience in engineering and heavy construction work of the character here involved, and two engineers of one of the other bidders, investigated, to the extent possible, the subsurface conditions in the several construction areas. They especially investigated the surface and sub-

surface conditions in the area, known in the record as the old phosphate strip mine area, through which the new NE-SW runway extension and taxiways 1 and 5, extended.

This so-called strip mine area, which had an elevation considerably higher than the areas which surrounded it, had been the site of phosphate strip-mining operations about 50 years previously which had left the area with a series of substantially parallel ridges and intervening depressions, and the entire area was covered with a heavy growth of trees, mostly pine with some maple and gum, up to one and one-half feet in diameter, and thick small growth and underbrush. It could be seen that the character of the soil in this area was a sandy clay loam (the type specified for use in constructing embankment fills) and that, with the exception of pools of stagnant water standing in certain low places in the depressions where there was no natural outlet drainage, the surfaces of the ridges and the depressions were dry and firm. These pools of water, into the bottoms of which plaintiff's engineer probed, were not large or extensive, and, for the most part, the depressions over some of which the engineer walked were found to be dry and firm.

Plaintiff and his engineer concluded from the facts obtained and obtainable with the facilities available, that the surface and subsurface conditions in this area, as well as in other construction areas, were firm and would be entirely adequate, when drained and cleaned, to support the required compacted fills, and that the indicated amount of approximately 27,215 cubic yards of excavation from the ridges, above the finished grade line shown on the plans, into the depressions was substantially correct and that no additional surface or subsurface excavation, beyond draining the pools of water and cleaning out the comparatively small amount of surface muck and debris visible at such spots, would be necessary in the performance of the contract work required in that area. In other words, plaintiff and his engineer concluded from the facts and information obtained, that since embankment fills 520 feet wide for the runway and 200 feet wide for taxiways and of considerable height, approximately 17 feet above the surface of the depressions, were to be constructed in this area, such fills, to be constructed of substantially dry material as called for, would "bridge over" these comparatively small wet places after they had been drained and cleaned out.

Before reaching this conclusion upon the facts and information obtained, plaintiff's engineer and the engineers of one of the other bidders obtained poles and probed as deep as possible into the pools of water, which ranged from about 1 to 4 feet in depth, and as a result of such probings found that beneath the water and surface muck thereunder, consisting of sand and decayed vegetation, the earth was hard.

The investigations made by plaintiff were as thorough and complete as was possible under the circumstances, and the conclusions reached by plaintiff are shown by the facts established by the record to have been justified and entirely reasonable from the standpoint of good engineering practice and proper construction procedure in connection with embankment fill construction work of the character provided for in the plans and specifications. These conclusions of plaintiff and his engineer, upon the basis of which plaintiff prepared and submitted his bid of 37 cents per cubic yard for "unclassified excavation" were subsequently concurred in by plaintiff's chief engineer, the engineer of one of the other bidders, the defendant's area engineer in charge of the work and the duly authorized representative of the contracting officer, the defendant's engineer-superintendent, and a number of other Government engineers and inspectors on the job. In addition to being familiar with the facts as to the surface conditions and those ascertained concerning the nature of the subsurface, the plaintiff and the engineers mentioned were experienced in the matter of estimating and judging, upon such facts as were here known, the effect of such surface water conditions as are here involved, the extent to which they were usual or unusual and the extent to which they were and were not indications of the nature of the subsurface conditions; that is, whether the subsurface material in the construction area was so wet and soft as to render the embankments unstable or

was sufficiently dry and firm to support the embankment fills.

The conclusions of plaintiff and of these engineers turned out to be wrong when they subsequently encountered unforeseen, latent and unstable subsurface conditions. Upon the undisputed facts they testified that the subsurface conditions were unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of this character. They described the subsurface conditions encountered as being very unusual and the worst they had ever experienced.

Plaintiff first commenced clearing and grubbing operations in connection with which he constructed the specified drainage ditches on either side of the construction areas, and installed drainage pipes and culverts. In connection with the excavation for drainage, which work did not disclose any unusual or unstable subsurface conditions, plaintiff drained off the pools of water in the construction areas for the NE-SW runway and taxiways 1 and 5, and with the use of bulldozers and draglines cleaned these areas of debris, surface muck and decayed vegetation preparatory to excavating and placing in such areas the required fill material.

Plaintiff's next operations in these areas, which were commenced about October 1, consisted of excavating the portions of the ridges above the finished grade line for the fill into the depressions, rolling the same for compaction, and hauling in borrow material to complete the fill. The operations were carried on under the strict supervision and direction of defendant's area engineer, who was on the job eighteen hours a day, seven days a week, his superintendent and inspectors, who were experienced engineers in this type of construction work. These officers were thoroughly familiar with the original physical conditions, those disclosed during and following each operation and the manner in which the work was being performed. Defendant's area engineer, superintendent and inspectors, approved the site as prepared by plaintiff before the commencement by plaintiff of any work of excavating and compacting the material from the ridges into the depressions, so as to ob-

tain a uniform grade, before bringing in borrow material. The evidence shows that the construction areas as prepared for the embankment fill material were not casually approved but that the area engineer, his superintendent and inspectors gave consideration, from the standpoint of proper engineering and construction methods and procedure, to the matter of the suitability and adequacy of the prepared surface to receive and support the required compacted embankment fill. They concluded, as had plaintiff's engineers, upon the facts then known and those which had been disclosed by plaintiff's operations up to that time, that the site was suitable and adequate for the construction thereon of the embankment. They thereupon directed plaintiff to proceed with the work of excavating the ridges into the depressions and compacting such material as required. The defendant's area engineer, Edward J. Locke, had had 25 years' experience in this type of construction work and the proof shows that he was very strict in seeing that plaintiff properly performed the work. During plaintiff's clearing and grubbing operations defendant's chief inspector examined the ground conditions in the depressions about October 1, 1942. He probed into the pools of water therein and found that the ground was firm underneath the water and surface muck.

Each of the ridges and depressions was of substantial width, and in the NE-SW runway and taxiway 5 the tops of the ridges averaged about 20 feet above the surface of the depressions. The height of the ridges ranged from about 2 to 8 feet in the construction area of taxiway 1.

As set forth in findings 23 and 24, the contracting officer had given the area engineer written delegation of authority to act as his authorized representative, which was orally continued and somewhat enlarged with respect to Locke's authority as area engineer respecting the performance of plaintiff's contract. In addition the contracting officer, whose office was located at Charleston, had employed in the Operations Section a construction engineer with 32 years' experience in work such as this, who acted as liaison officer and conferred daily and many times more often with the area engineer concerning the conditions and the

performance of the work, and he kept the contracting officer fully advised with respect to the work and the decisions and actions of the area engineer. The contracting officer visited the site of the work about once a week, made official inspection and conferred with the area engineer.

In the beginning of the excavation and grading operations in the ridge areas for the NE-SW runway extension and taxiway 5, the bulldozers, euclids and draglines experienced considerable difficulty in operating due to the fact that they would sink through the sandy top layer of the soil in the ridges. This condition, which was unknown and unanticipated by either party at the time the contract was made, was also experienced to a larger extent in connection with the clearing and grubbing operations. This soft condition on the ridge surfaces was not, however, very deep, and when this top layer had been excavated the earth was found to be firm. This condition did not disclose or indicate the unusual and unknown subsurface conditions here involved, which were not encountered until after considerable portions of the compacted fills in these areas had been constructed.

The ridges were excavated into the depressions in the NE-SW runway for a distance of approximately 1,200 or 1,500 feet over the full width of 520 feet and over a width of 200 feet in that portion of taxiway 5, which lay within this area.

Inasmuch as the excavation of the ridges down to the grade line did not supply sufficient material when rolled and compacted to fill the depressions, the contracting officer ordered that the ridges be excavated a sufficient distance below the finished grade line to provide a uniform surface over the entire width of the fills before hauling in borrow material to complete the embankments. This was done and the ridges were further excavated from 5 to 7 feet below the finished grade line. The rolling and compacting of the material, as called for by the specifications, as it was excavated from the ridges into the depressions did not bring to light any evidence of the soft, unstable and subsurface water conditions with which we are here concerned. When the uniform fill surfaces had been obtained, compacted fills probably 10 feet above the

original surface of the depressions had been constructed. Up to this time both parties believed the subsurface of the original ground to be firm and adequate, that a satisfactory base had been established and that the embankments constructed were stable. Plaintiff was instructed to begin work of hauling in, spreading and compacting borrow material for the purpose of bringing the entire surfaces of the fills up to the finished grade line for preparation of the subgrades thereon to receive the concrete pavements. This work was commenced shortly prior to October 27, 1942.

The subsequent operation on the fills of heavy trucks and euclid wagons used for hauling in borrow material, bulldozers for spreading, and sheepsfoot rollers for compacting such material, disclosed and brought to light for the first time that the subsurface of the original ground was not sufficiently firm, at least in spots, to support the required embankment fills; that the fills, due to their weight and the operation of heavy equipment thereon, had broken through the original ground surface into a very large amount of underground water which had saturated the subsurface material to such extent as to make it soft, mucky, and unstable.

As heavy hauling equipment moved over the fills some of the equipment would break through and in places the surface of the fills would swell and the water-soaked material, which had worked up through the fills, would break through the surfaces several feet from a loaded truck or a euclid, and the equipment would sink deep into the mass of wet material.

Notwithstanding the discovery of this condition the contracting officer, the area engineer, and other Government engineers, and plaintiff's engineers, did not then believe the matter to be serious and did not consider that extensive yardage would be involved in mucking out the wet spots, filling them with dry material and thereby properly compacting and stabilizing the embankments. Plaintiff was directed to proceed in this manner. In view of these conclusions plaintiff did not, at that time, believe that a substantial amount of additional expense would be involved and felt that he

could absorb the cost of correcting the condition in the manner stated.

Neither at that time nor later did the contracting officer or any of the Government engineers on the job consider that plaintiff had been in any way careless or negligent in the performance of the work, and under the facts it is clear that plaintiff had not been careless or negligent. Paragraph 4–03 of the specifications, relating to compaction and stability, provided that plaintiff would be required to replace any portion of embankments "which has become displaced due to careless or negligent work."

Throughout the performance of the work the engineers of the defendant and plaintiff had been of the same opinion concerning the nature and character of the subsurface conditions in the construction areas, on the basis of the known facts and those which could be reasonably ascertained and foreseen, as well as from their knowledge of the physical conditions of the site as they appeared originally and from time to time as the work progressed.

When the unstable condition above-mentioned was discovered in the NE-SW runway the defendant, believing it to exist only in a small area and in order to expedite the work, decided that it would not be necessary to compact the embankment over its entire width of 520 feet and that a stable embankment and a proper and suitable foundation for the 150-foot pavement would be obtained by limiting compaction to 95 feet on either side of the center line, or a strip 190 feet wide. Plaintiff was so directed on October 27. As the work of re-excavating the wet muck material progressed, it became evident that the condition was much more serious than the parties had at first believed. The area found to be affected by the underground water conditions became larger and more extensive and the dry material which plaintiff placed in the spots excavated became mud and muck. The unstable subsurface water and muck conditions increased both in area and amount as the depth of the excavation increased. On or shortly before November 21, 1942, it became certain that the conditions encountered were serious and extensive and that no reasonable estimate could be made as to the probable extent of the areas that would be affected by such subsurface conditions or the depth to which it probably would be necessary for plaintiff to excavate in order to overcome such conditions. Defendant revoked its prior order and directed that the entire embankment of 520 feet be stabilized and compacted. This order was later modified so as to confine compaction to a width of 400 feet, or 200 feet on either side of the center line, but subsequently it was again modified to require compaction in certain places over the entire width of the embankment.

Accordingly, on November 21, 1942, plaintiff wrote the contracting officer, who had been kept fully advised of the conditions, claiming changed conditions and requesting that he "investigate these changed conditions and make appropriate adjustment in the contract price." The contracting officer and his assistant in charge of operations came to the site on the same day and made an investigation of the conditions in company with defendant's area engineer, his superintendent and inspector, and plaintiff's engineer. At this point there is a conflict in the evidence as to what occurred when the contracting officer had completed his investigation of conditions, but from the greater weight of the evidence and the facts and circumstances established, it is our opinion and we have found that the contracting officer then concluded and found that plaintiff had encountered changed conditions within the meaning of Article 4 of the contract, and was entitled to an adjustment of the price to provide for any increase in cost resulting from such conditions, and directed area engineer Locke, his authorized representative, to so advise plaintiff. Locke did so by a letter to plaintiff on the same day as follows:

"Reference is made to your letter dated this date, addressed to the District Engineer in which attention of the Contracting Officer is called to conditions differing materially from those anticipated under your contract. You are instructed to proceed with the removal of this muck and to unwater the areas as directed by our Mr. Earle.

"Adjustment in the unit price or quantities will be made at the termination of the work to allow for additional cost."

The words "or quantities" were used in connection with the adjustment in the unit price because it is recognized that in some cases increased quantities under a unit price contract may have an important bearing upon the extent, if any, to which the unit cost has been increased. At that time it was not known what the increased quantities or the fair price for such work would be, but everyone knew that the conditions encountered would involve a considerable amount of additional work and costs. The conditions encountered made it necessary for plaintiff to rent and use on the job a large amount of additional excavating and hauling equipment for which he paid rentals of at least $392,747.62. Plaintiff also incurred large additional amounts of direct and indirect costs.

The so-called strip mine section covered an area of about 80 acres and, as we have said, the elevation thereof, including the depressions, was considerably higher than the adjacent areas. The soft and unstable subsurface conditions encountered were due to an unknown and unusually high underground water table, which appears to have been caused by the impervious character of the soil about 10 or 15 feet beneath the original surface of the depressions. Nothing in the strip mine section or in the areas adjacent thereto reasonably indicated the existence of this subsurface condition and it could not have been ascertained without the aid of borings. On the basis of the facts obtained and obtainable within the time allowed for submission of bids, neither the plaintiff nor the Government engineers had reasonable cause to believe that there existed a substantial distance below the original ground surface such a large amount of underground water, due to an unusually high underground water table, as would render the ground of the prepared site unsuitable and unstable as a base or foundation for the specified embankments.

Plaintiff diligently prosecuted the work of overcoming the unstable conditions encountered from October 27, 1942, until January 26, 1943. A comparatively small amount of such work was performed in taxiway 1, in February 1943. It was necessary for plaintiff to re-excavate from one-third to one-half of the embankment fills which had been constructed in the NE-SW runway and taxiway 5, and, in addition, to excavate to a depth of from 10 to 15 feet beneath the surface of the depressions and 20 feet beneath the surface of the fills before a firm foundation was reached. It was found that the underground water condition in the areas affected thereby, also existed under some of the ridges. Plaintiff performed similar subsurface excavation in the remaining southwest half of the NE-SW runway before this portion was graded and filled. Subsurface excavation was also performed in taxiway 1, but to a lesser depth. No fill had been placed in this area and the construction area of this taxiway, 4,600 feet long and 200 feet wide, was excavated to solid ground. In the performance of this subsurface excavation work it was necessary for plaintiff to use as many as thirty, 6 and 8 inch, pumps operating 24 hours a day, and to erect cofferdams and dikes in order to keep the subsurface water out of the particular area being excavated until such excavation was completed and dry fill material had been placed therein.

Upon the facts established by the evidence and summarized hereinabove, we have found and it is our opinion that plaintiff encountered "Changed conditions" in the construction areas of the NE-SW runway and taxiways 1 and 5, within the clear intent and meaning of Article 4 of the contract. The evidence as to the facts and circumstances concerning the subsurface conditions, the extent of the examinations and investigations originally made, and in support of the reasonableness of the conclusions reached by plaintiff when he submitted his bid, is consistent and uncontradicted. The only testimony in the record that "Changed conditions" were not encountered consists of opinions, unsupported by the facts on which based, of two Government witnesses, one of whom was the orginal contracting officer, to the effect that the nature and extent of the subsurface conditions encountered were obvious from the information indicated on the plans and a visual examination of the original site. From a consideration of all the evidence in the light of the conduct and

actions of these two officers during performance of the work, we think any thoughts they may have originally had were based on conjecture rather than knowledge and that the opinions now expressed are influenced by hindsight. We cannot, therefore, accord them any weight as proof. The Conqueror, 166 U.S. 110, 127–133, 17 S.Ct. 510, 41 L.Ed. 937. Moreover, we find that the opinions now given were first expressed seven months after the subsurface conditions were encountered, more than four months after the work of overcoming the subsurface conditions were completed and more than two months after all work had been substantially completed. The evidence shows that on a number of occasions subsequent to November 21, 1942, the plaintiff and defendant's area engineer, at plaintiff's request, asked the original contracting officer to make a decision on the amount of the increase to be made in the unit price for excavation by reason of the subsurface conditions encountered, due to the fact that plaintiff was incurring heavy additional expense and having to borrow large sums of money by reason thereof, and that the contracting officer at no time took the position or stated that it was his opinion that changed conditions had not been encountered. Instead he stated that he desired to postpone a decision on the amount of the increase in price until the quantities had been determined. The evidence further shows that during November and December 1942, when supplemental agreement No. 1 was being negotiated, similar efforts were made to have the increase in the unit price for excavation included in that agreement, to which the contracting officer replied that he desired to negotiate a separate agreement as to that matter. A reading of Supplemental Agreement No. 1 (finding 42), which was agreed upon near the end of December 1942 and executed as of January 2, 1943, also indicates the nature of the opinion which the contracting officer entertained at that time concerning the conditions encountered. In paragraph 4 of this agreement relating to additional clearing and grubbing and an increase of $200 an acre in the contract unit price for the original clearing and grubbing work, the contracting officer stated that "The mapped data and the investigation which the contractor could make in the time [allowed did not disclose] obstacles which later became apparent after access to all parts of the area became possible," and that "At the time the prime agreement was negotiated it therefore could not be foreseen that the condition of the area containing the strip mines was actually worse than could reasonably have been anticipated in the original investigations made by the contractor on the basis of detailed information available," This paragraph also contained the phrase—"* * * and in view of the subsurface, or latent conditions at the site being materially different from that expected * * *." Paragraph 1 of the agreement (relating to a reduction of six cents a cubic yard in the contract price for all borrow material used and to be used on the job as part payment for rental of equipment) also referred to the subsurface conditions encountered in the NE-SW runway extension and taxiways 1 and 5, as "unforeseen conditions."

Defendant says, however, that by reason of the provisions of paragraph 4–01 of the specifications, plaintiff was warned that he would be required to perform all excavation work necessary to complete the contract at the contract unit price of 37 cents a cubic yard even if the subsurface conditions encountered were unknown and unforeseeable. In other words, it is said that plaintiff assumed the risk of encountering unstable subsurface conditions in all embankment construction areas. Paragraph 4–01 is quoted in finding 18, and the portion relied upon stated that "Unclassified excavations shall include the removal of all material encountered regardless of type and/or class of material." This argument of defendant might be justified if we could ignore the fact that the contract, and of necessity the specifications, also contained Article 4. The purpose of specifications and drawings is to supplement the formal contract by delineating the details of the work to be performed thereunder and not to void an express provision written into the contract. Contract pro-

visions, such as Article 4 (finding 21) and paragraph 4–01, above-quoted, are to be reasonably interpreted in the light of the known facts and reasonable knowledge possessed by the parties as to conditions and "The intention of the parties is to be gathered, not from the single sentence above quoted, but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution." Miller v. Robertson, 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed. 265; P. Sanford Ross, Inc. v. United States, 50 Ct.Cl. 168, 174; Bethlehem Steel Co. v. United States, 75 Ct.Cl. 845, 868. Government specifications usually contain provisions substantially similar to the one above-quoted, which are intended to require that all work necessary to complete the job in good order shall be performed, but the bidder has a right to take into consideration the information and data disclosed in the specifications and on the drawings, and to read and reasonably interpret such provisions in the light of other provisions of the contract. In Peter Kiewit Son's Co. v. United States, 109 Ct.Cl. 517, which involved the effect of a provision concerning estimated quantities of work, the court said:

"The Government relies heavily upon the provision in Section 1.05 of the specifications, which we have quoted above. This section is found in many Government contracts, and it means that estimates made in invitations for bids for contracts which are to be paid for on a unit price basis are only estimates and not guaranteed amounts. But it certainly does not mean that Article 4 of the contract which promises a modification of the contract to conform to unforeseen subsurface or latent conditions, 'or unknown conditions of an unusual nature, differing materially from those ordinarily encountered * * *' is to be canceled out of the contract. Neither does it mean that all considerations of equity and justice are to be disregarded, and that a contract to do a useful job for the Government is to be turned into a gambling transaction."

See, also, Walsh Brothers v. United States, 69 F.Supp. 125, 107 Ct.Cl. 627, 630, 636, 644. Since the specifications and plans were based on surface conditions, measurements and estimates, without indication or representation as to subsurface conditions, and since the specifications and plans indicated considerable excavation above the finished grade lines for fills, but none beneath the base of the fills, the language of 4–01 cannot, in view of Article 4, be interpreted, as the Government says it should, as a warning or the expression of an opinion that unstable and unusual subsurface conditions existed. If the person who prepared this specification so intended, he succeeded in using language that was so indefinite and misleading as to conceal his intention. John K. Ruff v. United States, 96 Ct.Cl. 148, 164. We think the language of paragraph 4–01 is not, in the circumstances, susceptible of the interpretation which defendant seeks to place upon it and that plaintiff was justified in interpreting it as he did. But even if there should be a conflict between the language of this paragraph and the provisions of Article 4 of the contract, the latter would prevail. New Jersey Foundry and Machine Co. v. United States, 44 Ct.Cl. 570, 580; P. Sanford Ross, Inc. v. United States, supra, 50 Ct.Cl. at page 172.

Defendant further says that plaintiff's difficulties were due to the fact that he did not properly drain the surface water from the construction areas, but the evidence shows that such areas were properly drained and cleaned, and the Board of Contract Appeals expressly so found. As we have stated, the contracting officer's duly authorized representative and his inspectors examined and approved the areas as so prepared. Moreover, the Government had certain responsibilities in this connection. The last paragraph of paragraph 4–02 of the specification (finding 18) states that "Each layer of embankment and the natural ground, if necessary, shall be compacted at the moisture content specified by the C. O." Paragraph 4–03 provides that each layer of embankment material shall be consolidated when the moisture content is sufficient, in the judgment of the contracting officer, to insure obtaining the required density; that necessary tests for moisture con-

tent and density of each layer of material will be made as the work progresses, and that these tests will be made by the United States.

The next question is whether the decisions of contracting officer Patton and the Board of Contract Appeals that plaintiff did not encounter "Changed conditions" such as would entitle him to an adjustment increasing the contract price under the terms of Article 4, were such as to bar plaintiff's right to have this court consider the matter. The contract contained the standard Article 15, which provided that decisions concerning questions of fact should be binding on the parties.

In view of the findings on the facts established by the evidence and hereinabove discussed, we hold that the decisions made on the question of "Changed conditions" are not conclusive, and that under the rules discussed and applied in the concurring opinions of Judge Whitaker and Judge Madden in Maurice L. Bein v. United States, 101 Ct.Cl. 144, 165-170, plaintiff is entitled to have this court consider the question on the merits. In view of the facts disclosed by the record here, as well as by the records which were before the contracting officer and the Board of Contract Appeals, we are convinced that there was no substantial basis in the facts and the contract documents for the conclusions reached and that, in the circumstances, it was arbitrary action on the part of contracting officer Patton, and the head of the department, to hold that the subsurface conditions encountered by plaintiff were obvious from the information noted on the drawings and a look at the surface conditions at the site. In addition to being contrary to the uncontradicted facts disclosed by the record before it, the conclusion of the Board of Contract Appeals was not supported by any substantial evidence or by the findings which it made. In its opinion, the Board found that no subsurface explorations by borings had been made; that plaintiff investigated such conditions by probings and that in connection with the construction of the embankments, he drained and cleaned the construction areas.

The decision of the Board appears to have been based upon the unsupported opinions of two Government engineers and a misinterpretation of a number of provisions in the specifications and the provisions of Article 4 of the contract. For instance, the Board said that the provisions in the specifications relating to "preparation of subgrade," had reference to the base or foundation of embankments. This is clearly erroneous. The specifications concerning subgrades state that the subgrades therein referred to are the base courses on which pavements or surface courses are to be placed which, in this instance, were on the tops and not under the bottoms of the embankments. The specifications do not refer to the preparation of a "subgrade" for embankments.

We have already discussed the specification provision concerning "unclassified excavation" which we think the Board also erroneously interpreted and applied.

The contract work was practically completed by March 11, 1943. Shortly after April 1, 1943, contracting officer Patton and plaintiff determined and agreed upon the quantities of subsurface, wet and muck excavation and rehandled materials which, due to the lack of sufficient Government personnel, the character of the material involved and the circumstances under which the work had to be performed, could not be measured as the work progressed. The contract provided that the Government inspectors would keep a record of the work done. When the unforeseen subsurface conditions were first encountered in the NE-SW runway extension, several unsuccessful attempts were made to measure and keep a record of the quantities excavated and rehandled. In view of the circumstances and in order to expedite the work, the contracting officer decided and plaintiff agreed, that the quantities of additional muck and subsurface excavation found to be necessary or required by defendant in the several areas would be determined and agreed upon by the best and most practicable method, after such excavation work had been completed. This was done, and we have found that the parties used the best method possible under the circumstances and that the

quantities computed, agreed upon, and approved by the contracting officer, were reasonably accurate and were fair to both the Government and the plaintiff. Cf. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L. Ed. 684.

These quantities are summarized as follows:

| Construction areas | Fill required in cubic yards | Fill placed in cubic yards | Excess fill in cubic yards |
|---|---|---|---|
| NE-SW extension, and Taxis #1 and 5 | 564,308 | 913,759 | 349,451 |
| E-W extension and Taxi #4....... | 118,583 | 191,046 | 72,463 |
| N-S extension, Taxi #3, and minor areas ....................... | 108,983 | 178,151 | 69,168 |
| All areas ................... | 791,874 | 1,282,956 | 491,082 |

The parties also determined and agreed that the fair and reasonable amount of unmeasured subsurface, wet and muck material so excavated, which had to be rehandled, sometimes more than once, was 309,264 cubic yards. With the exception of 14,850 cubic yards of subsurface material previously cross-sectioned and handled twice in the north end of the N-S runway, all rehandling work, which represented 294,414 cubic yards, was performed in the NE-SW runway and taxiways 1 and 5, and was made necessary by the unforeseen and changed subsurface conditions encountered therein. By reason of the circumstances and conditions under which the work of rehandling the material had to be performed in the last-mentioned three areas, this work was much more difficult and expensive than the work of excavating ordinary or "unclassified" material originally contemplated by the contract.

Practically all the unmeasured as well as the measured subsurface material excavated was used, when it dried out, in constructing the several embankments in the areas where it had been excavated. A comparatively small amount of unsuitable subsurface material was hauled away, and wasted, but the amount so wasted was not measured

and the proof does not satisfactorily show the amount thereof.

The quantities excavated and rehandled as above-mentioned, totaling 800,346 cubic yards, were included in the total quantities of work done and used as a basis for final payment at the original contract unit price of 37 cents per cubic yard (findings 45–47). The only question here raised by defendant as to the above-mentioned quantities, or the method used in such determination, is that the total figure of 791,874 in the first column of the tabulation set out above, headed "Fill required in cubic yards," should be increased by 180,288 cubic yards, or to 972,162 cubic yards, to take care of shrinkage of earth used due to compaction. It is, therefore, contended that the total figure of 491,082, in the last column headed "Excess fill in cubic yards," should be reduced to 310,794 cubic yards. Defendant's evidence does not show that the contracting officer's determination of the quantity of 491,082 cubic yards was erroneous. Under the contract his determination was final, unless arbitrary or clearly erroneous. In arriving at the total figure of 1,282,956 cubic yards of material placed in the fills, the contracting officer did not include any amount on account of the subsurface material excavated and fill material originally placed and subsequently re-excavated, substantially all of which was later used in constructing the embankments. We think the amount of material so used but not included in determining the "excess fill in cubic yards" (491,082) over "fill required in cubic yards" (791,874), would more than offset the claimed shrinkage of

180,288 cubic yards in normal earth density due to compaction.

On the question of the amount of additional compensation which plaintiff should recover in excess of the 37 cents per cubic yard paid, the proof shows, without substantial contradiction, and we are convinced therefrom, that $1.50 per cubic yard is a fair and reasonable unit price for the subsurface, wet and muck excavation of 349,451 cubic yards performed by plaintiff in the construction areas of the NE-SW runway and taxiways 1 and 5, as a result of the unknown and changed conditions encountered (finding 49). Contracting officer Patton and the head of the department declined to inquire into the matter of what was a fair price for this work. At the fair and reasonable unit price of $1.50 per cubic yard, amounting to $524,176.50, less $129,296.87 paid at 37 cents per cubic yard, plaintiff is entitled to judgment for $394,879.63 for this part of the extra work.

It was necessary and plaintiff was required by defendant to rehandle most of the above-mentioned 349,451 cubic yards of wet and muck subsurface materials, and the contracting officer and plaintiff determined and agreed that, for the purpose of payment, 294,414 cubic yards were involved in this rehandling work in the NE-SW runway and taxiways 1 and 5 construction areas. From a consideration of all the evidence submitted in the light of the circumstances and conditions under which this rehandling work was done, we are of the opinion and have found (finding 49) that 75 cents a cubic yard is a fair and reasonable unit price for this part of the extra work. At this price, amounting to $220,810.50, less $108,933.18 paid at 37 cents a cubic yard, plaintiff is entitled to judgment for $111,877.32.

The fair and reasonable additional compensation due plaintiff for these two items of extra work is, therefore, $506,756.95.

The last question involved in plaintiff's claim is whether he is entitled to recover additional compensation for 141,631 cubic yards of subsurface material excavated, by the written direction of defendant of November 21, 1942, in the construction areas of the E-W runway and taxiway 4, the N-S runway, taxiway 3 and minor areas, and, also, 14,840 cubic yards rehandled in the N-S runway. These quantities were determined and agreed upon by defendant's engineers and plaintiff and were approved by the contracting officer. We have found that such determination was fair and reasonable. From the evidence, however, we are of opinion that plaintiff is not entitled to recover increased compensation for this work. No unforeseen subsurface or "Changed conditions" were encountered in these areas. The proof submitted by plaintiff is not sufficient to show that this excavation and rehandling work was substantially more difficult and more expensive to perform than anticipated excavation. The material involved was substantially similar to other ordinary or "unclassified excavation" contemplated and called for by the contract. On the record, we are of opinion that the amount of $57,894.27 paid therefor at the contract unit price of 37 cents per cubic yard was fair and reasonable.

During the trial of the case the defendant made an audit after an examination of plaintiff's books and records. It relies upon this audit in opposing plaintiff's claim and proof that $1.50 per cubic yard was a fair and reasonable price for the subsurface, wet and muck excavation work, and the work of rehandling a portion of such materials. Defendant also relies upon this audit in support of its counterclaim, hereinafter discussed.

In view of the facts as we have found them to be established by the record, the results arrived at in this audit are of little, if any, value as evidence because they are, for the most part, theoretical. We think plaintiff's currently kept books and records upon which plaintiff based his computations as to costs, more nearly reflect the true facts. The unit costs involved in the subsurface muck excavation and rehandling work, as computed by plaintiff from his books and from time cards and other detail cost data, is supported by the impartial and uncontradicted testimony of a number of experienced and qualified witnesses as to

the fair and reasonable cost and price for such work. ·

In several important respects we find defendant's audit to be based upon erroneous premises and unjustified assumptions, estimates and percentages.

### Defendant's Counterclaim

The defendant seeks to recover $191,727.-34 under three items of its counterclaim (finding 54), on the alleged ground that plaintiff was overpaid as follows:

1. Excess allowance of 243,947 cubic yards in connection with excavation below the original finished ·grade line in the NE-SW runway and taxiway 5................ $90,270.38
2. Excess allowance of 93,920 cubic yards in connection with stripping, stock piling and rehandling topsoil..... 34,750.40
3. Excess "muck" and other sub-surface excavation allowance of 180,288 cubic yards, in excess of performance, due to shrinkage by compaction ................. 66,706.56

The evidence offered by defendant is not sufficient to support any of the claimed excess allowances and over-payments. In the first place, defendant has the burden of overcoming the finality of the contracting officer's determinations of ·quantities, which involved questions of fact. It has ·not sustained this burden of proof. In the second place, the evidence offered in support of the alleged excess allowances is based on unjustified assumptions. As to item 1, it is assumed that plaintiff excavated only three feet below the finished grade line, which was an average on which the ·parties agreed as the basis for payment, whereas it was known at the time of the agreement that plaintiff would, and he actually did, excavate in many places, in the areas involved, from 5 to 7 feet below such finished line. Plaintiff's proof shows that the quantity determined and paid for at the contract unit price, on the basis agreed upon, was fair and reasonable.

As to item 2, it is assumed that plaintiff ·stripped topsoil only to a depth of 5 inches in all areas where such material was stripped and stock piled, whereas the proof shows that plaintiff, as authorized in the contract, stripped much deeper than 5 inches, and that this additional depth more than offset the areas where plaintiff was told not to strip and stock pile. The contracting officer's computation of quantity on the basis of an average of 5 inches, agreed upon October 7, 1942, over the entire construction areas was fair and reasonable.

As to the third item, defendant assumes that the matter of compaction was not considered and did not enter into the determination of the quantities of subsurface muck and other subsurface material excavated, and that only 1,282,956 cubic yards of material were placed in the several embankment fills for the new runways and taxiways. Defendant, therefore, says, that the figure of 791,874 cubic yards determined and agreed upon by the parties as "fill required in cubic yards," should be increased by 180,288 cubic yards to take care of compaction, and that when so increased the difference between the resulting figure of 972,162 and 1,282,956, supra, is 310,794 cubic yards, which should represent the amount of subsurface muck and other subsurface materials excavated instead of 491,-082 as determined and approved by the contracting officer and agreed to by plaintiff. Defendant's contention overlooks, first, the fact that the figure of 491,082 was, in part, necessarily the result of a compromise, and, second, the fact that practically all the unmeasured subsurface materials excavated were finally used in constructing the embankments but were not included in the figure of 1,282,956 cubic yards known to have been placed in the fills. It was not included because it was an unknown quanity, since the ·parties had been unable to measure it as the work progressed. The proof shows to our satisfaction that the amount of such material was more than sufficient to offset the amount of compaction claimed.

Under the terms of the contract plaintiff was to be paid for all excavation, either at the contract unit price or the price fixed under Article 4, on the basis of measurements of normal earth in place, and not on the basis of compacted yardage in embank-

ments. Embankments as such were not to be paid for.

The several items of the counterclaim are denied, and the counterclaim is dismissed.

Judgment will be entered in favor of the plaintiff for $506,756.95. It is so ordered.

HOWELL, MADDEN, and WHITAKER, Judges, and JONES, Chief Justice, concur.