**WALSH BROS. v. UNITED STATES.**

No. 46046.

Court of Claims.

Jan. 6, 1947.

WHALEY, Chief Justice, dissenting.

———◆———

Fred W. Shields, of Washington, D. C. (Henry M. Leen, of Boston, Mass., and George R. Shields and King & King, all of Washington, D. C., on the brief), for plaintiff.

Grover C. Sherrod, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff is a partnership which, on November 6, 1940, made a contract with the United States to construct temporary barracks at two forts in Maine and three in Massachusetts for $748,000. The Government issued its invitation for bids on October 24, 1940, and issued addenda thereto on October 29 and October 30. The proposed contract, specifications, and drawings sent out with the invitations for bids did not purport to show where the numerous buildings would be located on the areas of the forts. But the specifications, under the heading "Special Conditions," in paragraph 2, said that not less than five days prior to the opening of bids the constructing quartermaster would locate the position of each structure, and location stakes were accordingly placed.

The plaintiff's first claim is that, when it began to excavate for the foundations for some of the buildings at Fort Strong, Massachusetts, it encountered some old foundations, and was put to heavy ex-

pense in bringing in special machinery and in extra labor to overcome these obstacles. The plaintiff says that the existence and location of these old foundations were sub-surface and latent conditions which brought into play the provisions of article 4 of the contract which provided that an equitable adjustment should be made to compensate the contractor for extra expense caused by such conditions.

The Government says that the old foundations were not latent, but that parts of them were visible at the surface of the ground and would have put one who visit-ed the site on notice of what might be ex-pected under ground. We have found that this was true. The plaintiff concedes that the old foundations at Fort Andrews were visible, but says that the service club build-ing which was originally planned for the site of the old foundations was eliminated by an addendum on October 29, and a rec-reation building was added which was placed in the same location. This seems to us to be immaterial. We note that the plaintiff did not, in fact, visit either site before making its bid. We think the plain-tiff's first claim is not well founded.

■ The plaintiff's second claim is for extra wages paid to carpenters above the eighty cents per hour wage which was named in the contract as the minimum wage which must be paid. The facts in regard to this claim appear in finding 6. The Spe-cial Conditions of the specifications, para-graph 8, stated that eighty cents an hour had been determined by the Secretary of Labor to be the prevailing rate of wages in the vicinity of Forts Levett and McKin-ley, in Maine. This statement was true. But on October 24, which happened to be the day the invitations for bids, containing these specifications, were sent out, the car-penters union in the area had decided to demand $1.00 per hour, beginning Novem-ber 15, and to refuse to work for less. So far as appears, neither the Government nor the plaintiff knew this when they made their contract on November 6. From No-vember 15, the plaintiff was obliged to pay the higher wages and it sues for the dif-ference. It may not recover. The Gov-ernment's statement in the specifications was only a statement of an existing fact.

It was not a warranty that, within the pe-riod of performance of the contract, work-men would not demand increases in wages. This case is different from that of Albert & Harrison, Inc. v. United States, Ct.Cl., 68 F.Supp. 732, in which the Government's statement as to what the prevailing wage had been found by the Secretary of Labor to be, was erroneous.

■ The plaintiff's third claim is for ex-cavation, and its sixth claim is for fill, which, it says, it was required to make, but was not bound by its contract to make. Paragraph 2 of the Special Conditions of the specifications is copied in full in find-ing 7. It says, inter alia:

" * * * The natural grade of the site will be the finished grade, except where it must be altered to prevent the accumulation of water under and about the buildings as required by the specifications.

*   *   *   *   *   *   *

"The amount of excavating and backfill-ing is in no way affected by the variation in grade level; therefore, excavating will not be considered as an extra to the con-tract in any degree.

*   *   *   *   *   *   *

"On account of the irregular nature of the terrain at all of the building locations, the contractor shall be absolutely certain of the conditions by personal examination of the site before submitting a proposal. No appeal for extras will be entertained be-cause of ground conditions except as de-scribed above."

Paragraph 2 of the General Conditions of the specifications, quoted in finding 4, said:

"Visiting site.—The bidder should visit the site and acquaint himself as to local conditions, availability of water, electric power, roads, soil conditions and the re-lation of finished grade of the building to existing grades and the natural surface of the ground."

As appears in finding 4, the invitation for bids stated that not less than five days prior to opening of bids the location of each building would be staked out on the ground, and the "definite grade of floor" shown.

The buildings were staked out, at the forts to which this claim relates, at the time promised. But several of the buildings at Fort Andrews and at Fort Banks were not staked out to make the natural grade the finished grade as paragraph 2 of the Special Conditions of the specifications said they would be. Instead, the grade marks on the stakes showed that they were to be built on a level terrace, formed by a considerable excavation on the uphill side and a corresponding fill on the downhill side of the buildings. The unit price stated in the contract for extra-excavation was $3 per cubic yard and for extra fill $2. At these prices the proper charges for excavation and fill, respectively, in excess of what would have been required if the natural grade had been adhered to, would be $10,051.80 and $1,178.

This claim is difficult to resolve. On the one hand, the Government's statement that the natural grade of the site would be the finished grade, is clear and unequivocal. It meant that a contractor would not have to do more than cut off small humps and fill up small depressions that did not conform to the general slope of the land; would have to build his chimneys and steps to the natural surface, wherever that might be, and would be paid extra if any of his piers or walls were more than seven feet high. Upon this clear statement, a contractor could, with substantial accuracy, and this plaintiff did, compute its costs in its office without visiting the site to look at the grade stakes.

On the other hand, the several admonitions in the contract papers about the necessity for visiting the site and seeing the location of the buildings and the relation of the finished grade of the buildings to existing grades and the natural surface of the ground, and the warning that excavating would not be considered as an extra "in any degree," are certainly pointed, though the point of the last item is dulled somewhat by the provision in the contract for an agreed unit price for extra excavation.

On the whole, we think the plaintiff should recover on these claims for extra excavation and fill. We think that the terracing of the buildings instead of letting them stand on the natural grade had nothing whatever to do with preventing the accumulation of water under and about them. The best possible run-off of water from such structures, located as they were on hillsides, would be the natural drainage. We think therefore that the persons who staked out the buildings either were not familiar with or paid no attention, in these cases, to what was written in the specifications. The time allowed between the invitation and the opening of the bids was short, the locations were promised only five days before the opening, a large number of projects at different locations were submitted to the same contractors for bids, and it was not, we think, strange that the plaintiff should have assumed that it could rely on the clear statement as to how the buildings were to be located with reference to the natural grade. We think that it had a right to so rely, without subjecting itself to the peril that grades on the ground would not conform at all to the statement in the specifications.

The plaintiff's fourth claim is for extra expense which it incurred because other contractors installing water and sewer lines, dug trenches in its access roads to its work, making it necessary for it to carry some of the materials by hand during the period of the interference. The plaintiff must have been aware that these utilities' services would have to be installed while its work was being done. It was building these barracks in a hurry for expected incoming troops, and knew that immediate occupancy was necessary. Its contract, and that of the utility contractors, provided for other contemporaneous work of other contractors and required that they coordinate their work. The plaintiff does not complain that the other contractors were not considerate of its interests, or made its situation any more difficult than was necessary. Its complaint seems to be that the Government should not have permitted the utility contractors to do their work at the time they did it. We think this claim is not well founded.

The plaintiff's fifth claim is that the Government should not have deducted, as it did, the sum of $5,615 in liquidated damages for late completion of the contract. There

was late completion of various buildings and the amount deducted was properly computed in accordance with the applicable provisions of the contract. But the plaintiff says the late completion was excusable under article 9 of the contract, which is quoted in finding 9. The delay was caused by difficulties which the plaintiff's subcontractor for the heating equipment had in obtaining the equipment and the sheet metal workers necessary to install it. When the money was withheld by the Government from the plaintiff, it, in turn, withheld the same amount in its settlement with its subcontractor, and is here suing on this claim for the benefit of its subcontractor.

We think that it has not been shown that the delay in question, or any definite part of it, was excusable within the meaning of article 9 of the contract. There was severe competition for the available supply of heating materials and labor, but we think the proof does not show that the scarcity arose from unforeseeable causes of the kind covered by article 9.

The plaintiff is entitled to recover $11,229.80 on its claims Nos. 3 and 6.

It is so ordered.

JONES, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice (dissenting).

I think the plaintiffs are entitled to recover the wages prevailing in the environment.