**PETER KIEWIT SONS' CO. et al. v. UNITED STATES.**

**No. 47562.**

Court of Claims.

Nov. 3, 1947.

Dan MacDougald, of Atlanta, Ga., and J. M. Martin, of Los Angeles, Cal. (Robert S. Sams, of Atlanta, Ga., and Martin & Martin, of Los Angeles, Cal., on the brief), for plaintiffs.

Gaines V. Palmes, of Washington, D. C., and Peyton Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The Government has demurred to the plaintiffs' petition. We therefore state the facts as the plaintiffs have alleged them in their petition. On October 30, 1943, the

plaintiffs, three corporations acting as joint contractors and co-adventurers, entered into a contract with the Government for the grading required for the proposed extension and reconstruction of the air field runways at Hensley Field, Texas. The contract fixed unit prices per yard for the amounts of earth to be moved, and the amount to be paid was estimated at approximately $1,832,000. The work was to be commenced by November 2, 1943, and completed by May 1, 1944. It was completed on time.

Hensley Field was bounded on the south by Mountain Creek Lake. The former north-south and northwest-south east runways ended at the lake shore. The new runways were to extend into the then area of the lake, and the fill for that extension of the north-south runway was to block the channel of Cottonwood Creek, the then outlet of the lake. A new outlet channel for the lake was to be excavated under the contract. The material procured from the excavation of the new channel, as well as that procured from the grading of the field was to be used in making the fill necessary to extend the runways into the lake. It was known, however, that the material from these two sources would not be enough to make the fill, and that additional material would have to be brought from a "borrow" area designated by the Government. The principal problem in the case arises out of the facts concerning the borrow material.

The plaintiffs obtained their contract by competitive bidding. With a view to making a bid, representatives of the plaintiffs visited the site on October 25, 1943. They had been furnished plans of the work showing the contours and slopes of the three types of excavation, i. e., field, channel and borrow, but had not yet been given the specifications and blue prints for the work. Their representative telephoned Mr. C. M. Weller, who was in the Negotiation and Contract Section of the United States Engineers' Office at Denison, Texas, for information as to the quantities of excavation. Mr. Weller told him that the estimated quantities were 700,000 cubic yards from the field, 1,600,000 cubic yards from the diversion channel, and 2,300,000 cubic yards

from the borrow. The plaintiffs, on October 26, checked the plans which showed that the above amounts were correct as to the field and channel. They then figured the cost per cubic yard of each type of excavation with a view to making a separate unit price bid for each type. The prices computed by the plaintiffs were 31.392, 51.23 and 29.77 cents per cubic yard for field, channel and borrow excavation, respectively.

On October 27, the representatives of the plaintiffs went to the District Engineers' Office at Denison, and were, for the first time furnished with the specifications and blue prints for the work. From the specifications they learned that they must submit a single unit price bid for channel and borrow excavation. As shown above, their intention had been to bid 51.23 cents for the channel excavation and 29.77 cents for the borrow excavation, the former being much more difficult and expensive than the latter. The plaintiffs, therefore, computed a unit price bid for all three types of excavation by taking an average of their proposed separate bids weighted in accordance with the estimated amounts of each type of excavation. Their bid was 37.476 cents per cubic yard, which meant that they counted on a contribution of 6.108 cents and 7.44 cents from each estimated cubic yard of field and borrow excavation, respectively, to make up for the difference between the bid price of 37.476 cents and the intended separate bid price of 51.23 cents for the channel excavation. The plaintiffs' bid was accepted and the contract was entered into.

While the work was in progress the Government notified the plaintiffs that the finished grade for the borrow excavation was being changed and that the amount of the borrow excavation would be reduced by 750,000 cubic yards. The plaintiffs promptly informed the Government that this change would increase the composite unit cost of the work. They finished the work, and were paid their bid price of 37.476 cents a cubic yard for the yardage actually excavated. The plaintiffs presented their claim to the Contracting Officer who denied it on June 1, 1944. In accordance with Article 15 of the contract, they appealed to the

Secretary of War, who referred the appeal to the War Department Board of Contract Appeals. The Board found that the cost of the channel and borrow excavations were not comparable, and that the contractor had sustained a loss of profits of $82,600 on the work actually performed but denied the plaintiffs' appeal on the ground that the shortage in the borrow yardage was not unreasonable or unforeseeable in view of the difficulties of the problem incident to the nature of the undertaking; that the contract was speculative in nature and that "the estimate of borrow and the basic estimate of total excavation of which it rested were estimates only, for which the Government's responsibility was expressly limited by the specifications quoted above." The specifications referred to were Section 1.05, Quantities: "The estimate of quantities of work listed in the Schedule of Items to be performed under these specifications is given only to serve as a basis for canvassing offers and for determining the approximate amount of the consideration of the contract. Within the limits of funds available, the contractor will be required to complete the work * * *, be the required quantities more or less than the amounts estimated." And the notation on the drawings which fixed the location and the original and finished contours for the borrow area: "Note: Contours in Borrow Area may be revised to provide fill material as required."

Both the Government and the plaintiffs, when they entered into the contract, believed that the ratio of 1,600,000 cubic yards of channel excavation to 2,300,000 cubic yards of borrow excavation could be relied on for the purpose of basing thereon a composite price per yard for the total yardage of the estimated 3,900,000 cubic yards of the two types of excavation.

On the basis of the above-recited facts, the plaintiffs claim that they are entitled to an equitable adjustment pursuant to Article 3 or Article 4 of the contract, which are printed in a footnote,[1] or by reason of a mutual mistake of fact, or for damages for breach of contract by reason of a material variation in the work as represented in good faith by the Government and relied upon by the plaintiffs.

The Government, as we have said, demurs to the petition. It urges that plaintiffs agreed to do the work at the bid unit price, regardless of what the quantities of the different types of excavation turned out to be.

We think that the petition states a valid ground of recovery. It alleges that

---

[1] "Article 3. Changes.—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

"Article 4. Changed Conditions.— Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications or unknown conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. * * *."

both the Government and the plaintiffs entered into the contract in the belief that the amounts of the different types of excavation were approximately as estimated. If they did so, the contract was not intended by the Government to be speculative, as the War Department Board of Contract Appeals said, but was perfectly capable of being computed and bid conservatively. It was obvious that, a composite bid being required, a great variation in the proportion of the different types of excavation would be ruinous to the contractor, or would cause the Government to pay far more than the work was worth. We have no reason to suppose that the Government intends to make its contracts on any such irrational basis. If, as alleged, the parties believed that the estimated proportions of the different kinds of excavation would prove out in the performance, it would appear that they would not have made the contract which they did make except for their mistake as to the facts. Such a mistake calls for a reformation, in equity, of the contract.

■ The Government relies heavily upon the provision in Section 1.05 of the specifications, which we have quoted above. This section is found in many Government contracts, and it means that estimates made in invitations for bids for contracts which are to be paid for on a unit price basis are only estimates and not guaranteed amounts. But it certainly does not mean that Article 4 of the contract which promises a modification of the contract to conform to unforeseen subsurface or latent conditions, "or unknown conditions of an unusual nature, differing materially from those ordinarily encountered * * *" is to be canceled out of the contract. Neither does it mean that all considerations of equity and justice are to be disregarded, and that a contract to do a useful job for the Government is to be turned into a gambling transaction.

In cases such as Sandor S. Hirsch and Pernice Contracting Corporation v. United States, 104 C. Cl. 45, and Morris & Cumings Dredging Co., Inc., v. United States, 78 C. Cl. 511, cited by the Government, there was a large excess of units above the estimates in the actual performance. But there was no question of a composite bid for two wholly different types of work where the prerequisite to a rational bid would be an approximately accurate estimate of the proportions of the two types of work. Instead, the contractors in those cases made improvident bids upon which they lost money, even on the estimated amounts, and for that reason only they desired not to increase their losses by performing additional units of work. They expected to make a profit on the estimated number of units, and would have made the same or perhaps a larger profit on a larger number of units if their bids had not been too low to allow any profit at all. They could not assert that they would not have made the contract except on the assumption that the estimated amounts were approximately correct.

The defendant's demurrer is overruled. It is so ordered.

Howell, Whitaker and Littleton, JJ., and Jones, C.J., concur.