**FEHLHABER CORPORATION**
v.
**The UNITED STATES.**
**No. 49316.**

United States Court of Claims.
June 5, 1957.

John W. Gaskins, Washington, D. C., for plaintiff. King & King, New York City, were on the briefs.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Herbert M. Canter, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This suit arises as the result of a contract entered into by plaintiff, Fehlhaber Pile Co., Inc.,[1] a New York Corporation, with the defendant, acting through the War Department, for the construction of the substructure for the Chesapeake City Highway Bridge located at Chesapeake City, Maryland. Plaintiff alleges that during operations under the contract it encountered subsurface conditions which differed materially from those contained in the specifications and as a result thereof incurred additional expenditures in driving interlocking steel sheet piles for a cofferdam needed in the construction; in excavating for the pier designated Pier 1–N which was constructed within the cofferdam; and in driving steel H piles to support the pier. Plaintiff contends it is entitled to payment for the added expenditures in an amount in excess of $100,000 pursuant to the *Changed conditions* article of the contract. Plaintiff also seeks the return of liquidated damages assessed against it in the amount of $10,000 because of its failure to complete the contract on time.

The contract which called for the construction of 32 piers and 2 abutments

1. Subsequent to the filing of this suit, plaintiff's name was changed from Fehlhaber Pile Co., Inc. to Fehlhaber Corporation.

for a bridge over the Delaware Canal included standard *Delays-Damages* and *Disputes* articles as well as the standard *Changed conditions* provision and was awarded after the publication of an Invitation for Bids which provided in part as follows:

"Bidders should carefully examine the drawings and specifications, visit the site of work, and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. * * *"

Defendant employed an architectural-engineering firm to make borings and compile boring logs showing the subsurface conditions at the various pier locations. This analysis, which also noted the number of blows per lineal foot required to drive the sampling spoon at the various depths, was made available to prospective bidders and indicated the type of materials that could be expected to be found to below elevation—100 feet, and was part of defendant's specifications for the job. For various reasons, including inconsistencies in the number of blows required to penetrate similar type materials, the number of blows on the sampling spoon was considered of little value to prospective bidders in determining the ease or difficulty with which the work at the subsurface could be accomplished.

As pertains to Pier 1–N, the subject of this suit, two borings, designated 1–NE and 1–NW, were made. Boring 1–NE showed no hard materials of any kind to elevation –50 to –51 where there was a foot of soft sandstone. At elevation –55.7 to –57.4, 1.7 foot, sandstone core was encountered and shown on the boring logs. Possible sandstone stratum was indicated at –90 to –91 feet.

Boring 1–NW showed soft sandstone from –44.3 to –45.2 and particles of sandstone between –45.2 and –52.0. From –53.9 to –54.9, sandstone, no core was reported. Pieces of sandstone were reported from –83.4 to –85.8. There were no other evidences of hard materials in the subsurface which would cause any difficulty during construction according to the boring logs.

The contract drawings showed the bottom of the footing for Pier 1–N at elevation –48, which would require excavation to be performed to that depth. The materials described on the contract borings to that elevation would have been easy to excavate, and from an engineering standpoint, nothing in the boring logs could reasonably have been construed as indicating that difficulty in the performance of the excavation would be experienced.

Plaintiff based its bid upon the information contained on the contract drawings and upon the conclusion that the materials to be encountered could be readily excavated.

Below –48, steel **H** piles were to be driven to support the pier. The materials described in the boring logs, both above and below the sandstone layers below that depth, should not have been difficult to penetrate. Resistances on the sampling spoon did not suggest or reveal materials which would cause high resistances to **H** piles driven by a heavy and powerful hammer. The soft sandstone at elevation –50 in boring 1–NE and –53.9 in boring 1–NW would offer little, if any, more resistance to **H** piles than would any other unconsolidated materials in the subsurface. The sandstone from –55.7 to –57.4 was not considered by plaintiff to be difficult to penetrate if the conditions underlying it were substantially as reported, such underlying conditions being reported as unconsolidated materials.

Concerning these borings, the contract and the specifications contained the following provisions:

"Article 1. *Statement of work* —The contractor shall * * * perform the work * * * *in strict accordance with the specifications,* schedules, and drawings, all of which are made a part hereof and designated as follows: * * *"

Paragraph SC–7 of the Special Conditions of the Specifications provided in part as follows:

"SC–7 Physical Data. The information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interpretation, or conclusion drawn therefrom by the Contractor.

\* \* \* \* \* \*

"d. *Foundation Conditions.*— The contract plans show the results of borings and test piles driven at the site. Any conclusions drawn therefrom by the contractor as to the surface and subsurface materials to be encountered, the methods required to complete the construction shown on the plans, and the necessary lengths of piles are at the contractor's risk. The Government assumes no responsibility for the accuracy of the borings and tests above referred to or the published results thereof, nor does it represent that materials other than or in proportions different from those shown will not be encountered. Samples of materials removed from the bore holes may be seen at \* \* \*."

Paragraph GC–2 of General Conditions of the Specifications provided as follows:

"GC–2. Site Investigations and Representations. The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. \* \* \*"

The plaintiff did examine the site of the proposed construction and the physical samples that defendant acquired from its borings. It did not, however, make borings of its own because of the limited time allowed for bidding and because the existence of regularly scheduled traffic in the channel would have made such an attempt impracticable. The record also discloses that it was not contemplated that prospective bidders would conduct boring operations and in fact it was not done. Plaintiff prepared its bid on the basis of the plans and specifications submitted by defendant, was subsequently awarded the bid and ordered on June 3, 1946, to commence operations. The contract called for completion by December 22, 1946. For various reasons, none of which were granted expressly for changed conditions, extensions were granted which pushed the contract completion date up to June 7, 1948. The defendant did not consider the contract substantially complete until July 27, 1948, and, therefore, assessed liquidated damages for 50 days at the rate of $200 per day as called for in the contract and in the total amount of $10,000.

Plaintiff had on numerous occasions during the period of construction notified defendant that it intended to make, and in fact was making, claim for excessive costs in accordance with the *Changed conditions* article of the contract, its contention being that the excess costs arose because the subsurface conditions materially differed from those shown on the contract drawings and specifications. .

Defendant first denied such relief by letter from the contracting officer on

September 15, 1947, wherein he referred to plaintiff's oral request for changed conditions relief during a telephone conversation on September 4, 1947, and advised that an investigation showed no changed conditions existed. He further notified plaintiff that no written contentions had been received and suggested procedure under article 15, the *Disputes* provision, within the next 30 days.

Written application had already been made by plaintiff, however, on September 12, 1947. By letters of October 3, October 10, and November 5, 1947, plaintiff set forth the details and extent of the excess costs claimed to have been incurred in the driving of the sheet piling and excavation for the pier base.

By letter of November 25, 1947, plaintiff submitted to the district engineer its claim for additional compensation covering the driving of H piles at Pier 1–N. This claim was also based on the *Changed conditions* provision.

The contracting officer on December 3, 1947, denied plaintiff's claim for changed conditions at Pier 1–N. Thereafter, plaintiff was permitted to file two additional affidavits and the case was forwarded to the district engineer, the contracting officer's superior, who, under date of March 1, 1948, executed and transmitted to plaintiff written findings of fact denying changed conditions relief.

Plaintiff appealed under the *Disputes* article of the contract on March 18, 1948, and was given a hearing by the Corps of Engineers Claims and Appeals Board which denied plaintiff's claim in a written opinion dated February 15, 1949. This action was reviewed on February 25, 1949, and approved by the Chief of Engineers who was the duly authorized appellate authority. Plaintiff was notified of this action on March 14, 1949. Action was instituted in this court on September 28, 1949.

■ Defendant's initial defense here is that the administrative findings of fact and decision are final and conclusive on the parties as they were supported by substantial evidence. The Government contends this court cannot resort to a consideration of our own *de novo* findings unless and until we have, at the very threshold, reviewed the entire administrative record as a whole and found that that record did not contain substantial evidence to support the administrative findings and decision. In effect the Government says that a *de novo* hearing by this court is a nullity if the administrative decision is supported by substantial evidence in the administrative record as a whole, and that such *de novo* hearing should not even have been embarked upon if such substantial evidence existed.

Similar contentions in a similar situation were made by the Government in the case of Volentine and Littleton v. United States, D.C., 145 F.Supp. 952, and were rejected by the court.

While the writer of this opinion dissented in that case and still adheres to the views expressed in that dissent, he must bow to the majority and we hold against the Government's argument here.

Since Volentine and Littleton settled the problem there is no need for any comment thereon. The only thing we must decide now is whether the decision of the Corps of Engineers Claims and Appeals Board, approved by the Chief of Engineers, is supported by substantial evidence adduced at the trial *de novo* before this court notwithstanding the administrative record.

Defendant asserts that plaintiff's problems resulted from a miscalculation on its part of the difficulties to be encountered and that there was no material difference in the location or amount of material encountered from that reported in the defendant's specifications. Defendant also asserts that plaintiff's operations on the whole were inefficient.

■ These assertions, however, are not supported by the record which shows unquestionably that subsurface materials encountered at Pier 1–N materially and substantially differed from that which could be expected from a study of the contract drawings and specifica-

tions. The evidence also shows that plaintiff's operations at the site were reasonably efficient and that the equipment used was reasonably adequate for the job.

In this light, the decision of the Corps of Engineers Claims and Appeals Board is not supported by substantial evidence and is in fact contrary to the overwhelming weight of the evidence as the ensuing discussion herein will point out. The differences encountered by plaintiff fall squarely within the standard set forth in article 4 of the contract defining that which will constitute changed conditions.

Details of the problems encountered by plaintiff in driving the steel sheet piles for the cofferdam at Pier 1–N, in the excavation at Pier 1–N, and in driving H piles at Pier 1–N are set out in findings 18 through 79 and will be repeated herein only to the extent necessary to show the existence of changed conditions.

The cofferdam was to be constructed of 136 interlocking steel sheet piles which, according to the contract, were to be driven to approximately elevation –54.0 to –56.0, the top of a rock stratum. As noted previously, plaintiff anticipated no difficulty in driving to the prescribed depth because of the composition of the subsurface. Except for the previously indicated layers of sandstone, all other materials were sand, clayey sand, or gravel. Nevertheless, severe resistance was encountered from elevation –21 to –26 and from elevation –37 to –55 and the use of a jet was necessitated in driving at those points. Because of this resistance, and because of the necessity of applying an excessive number of blows of the steam hammer to the piles in an effort to drive them through the unexpected materials encountered, 30 percent of the piles were damaged and it was necessary on several occasions to burn off 3 to 5 inches of the butt ends. The substrata was so hard that some 20 to 30 of the sheet piles could only be driven to about four feet above the specified depth. Their tips rested at or about elevation –52 or –53, where the

contract borings indicated sand or clay. The high sheets were driven to grade only after excavation was completed and by use of an oversized hammer. Work on the cofferdam was completed on April 10, 1947. On or about April 8, 1947, plaintiff orally advised defendant's district engineer of the difficulty encountered and that it would probably make claim for additional cost due to changed conditions.

After work on the cofferdam was completed, work began on the excavation which the contract required to be performed down to elevation –48. According to the borings, little trouble should have been encountered in this work as there was little or no hard materials down to that depth. Notwithstanding this, however, excavation between –21 and –26 was extremely difficult and was delayed considerably because much hard material difficult of excavation was encountered. At –21 feet, a 42-foot open end pipe weighing 1,700 to 1,800 pounds was permitted to fall some 20 to 25 feet onto the hard surface but was unable to penetrate until about 100 blows of a 6,-700-pound steam hammer were applied to the pipe. This drove the pipe five feet. Three feet of sandstone and sand were recovered from the pipe at this level where according to the borings only fine sand, clay and gravel should be encountered. Generally, excavation between –21 and –26 was difficult enough to require the use of a water jet and a 1,200-pound pipe to break up the hard surface before excavation could be effected. After elevation –21 was reached, the ¾-yard bucket that was used up to that point had to be replaced by a one-yard heavy-duty clamshell bucket with 8-inch steel teeth. During the excavation, these teeth were often worn to the point where they needed replacing. The extreme resistances that were being experienced continued to –26.

From –26 to –37 no undue difficulty was met. From –37 through –48, sandstone continually slowed up progress. The use of a jet was necessitated and it was used in the west end of the coffer-

dam from −37 to −46.6 and on the east end between elevations −37 and −42.

At the suggestion of the defendant's resident engineer a 50-foot steel H beam weighing about two tons with a sharpened point was used as a chopping bit to penetrate and break up the sandstone. It was dropped from a height of about 30 feet with a resulting 60,000 foot-pounds of energy being exerted in each drop.

The use of a jet and the 1,200 pound pipe between −21 and −26 and the use of the 50-foot two-ton steel H beam between −37 and −48 are considered extraordinary procedures when subsurface conditions are as should have been encountered according to the contract drawings and specifications.

Because of the existence of sandstone throughout the entire subsurface area of the cofferdam, plaintiff was advised on September 8, 1947, that defendant would accept as the final grade for Pier 1–N a higher elevation than the specified −48. When excavation was finally completed the average grade was −46.6 and the entire bottom of the cofferdam was covered with hard sandstone.

Plaintiff, at its own expense on several occasions had an independent laboratory analysis made of the materials being encountered. Of materials recovered at −21 and −23 the report was that the rock consisted of finely laminated to massive silt stone ranging to clay stone, consisting of thin bands of clay intermixed with fine silt, and some bands rather firmly cemented by iron oxide. The compressive strength of the softest layer was 481 pounds per square inch, and the hardest, containing iron ore cement, was 2,390 pounds per square inch. This rock was quite friable in that particles of silt could be rubbed out of the clay matrix, particularly when dry. The samples revealed a type of material compact in mass which had the faculty of absorbing a blow without shattering or crumbling over an area of more than an inch or two from the point of impact. From an engineering standpoint, the material represented by the samples was a soft sandstone which would be very difficult to excavate. Rock, such as represented by the samples, weakens with excessive moisture or upon air drying, and has its maximum strength under normal subsurface conditions.

Two samples recovered at −42, each of which were solid pieces of stone and weighed 500 pounds, were also independently analyzed and tested and found to be sandstone, the largest part of which consisted of an aggregate of quartz grains cemented with calcium and iron carbonate, the rest being numerous laminated layers varying from as little as $\frac{1}{8}$ inch up to a few inches thick of material cemented with iron oxide or bog iron. Approximately 36.5 percent of the rock was cementing agents with the rest being particles of sediment. It was a firm aggregate of cemented sand. Compressive strength of this stone ranged from 1,590 to 2,380 pounds per square inch. Typical sandstone, according to the authoritative Handbook of Physical Constants, ranges from 1,560 to 3,500 pounds per square inch. This rock has considerable resistance to the kind of stresses exerted by heavy equipment used in excavation. The sand grains of this stone are completely unaffected by moisture and its cementing agents are practically insoluble in water. It would have no tendency to soften or weaken in water, but would have the same attributes in its natural state as it did in a dry condition in laboratory testing.

These samples from elevation −42 represented material more difficult to excavate than the material of which samples were previously obtained at elevations −21 to −23.

Plaintiff's problems did not stop after excavation was completed. The contract called for 231 steel H piles, each 55 feet in length, weighing 89 pounds per foot, to be driven within the cofferdam to support Pier 1–N. Each pile was to be driven at least 40 feet below the bottom of the excavation at −48, or to elevation −88, and until such pile attained a safe bearing load of 60 tons as determined by a specified formula with a hammer

that developed a minimum of 19,000 foot-pounds of energy per blow. To achieve the 60 tons of bearing capacity, the formula called for resistance of each pile at the rate of 90 blows per foot for the last foot after minimum penetration of 40 feet. If a pile reached required resistance at the minimum depth at −88, the excess length of projection above the bottom of the excavation could be cut off. If the 55-foot pile was driven to maximum depth, its tip end would be 47 feet below elevation −48 or at −95.

According to the contract boring logs, there were no layers of sandstone between elevations −46 and −88 except one foot of sandstone between elevations −53.9 and −54.9 on boring 1−NW and one foot of soft sandstone between −50 and −51, and 1.7 feet of sandstone between −55.7 and −57.4 on boring 1−NE.

Because of unconsolidated materials which the boring logs indicated were underlying the sandstone at the indicated elevations, no trouble was expected to be encountered in penetrating the sandstone layers.

Plaintiff met little trouble between −46.6 and −55; however, between −55 and −57.4 maximum resistances of 90 blows or less per foot were encountered on 178 of the 231 steel H piles being driven; 91 to 180 blows per foot were needed on 37 of the piles; and 181 to 399 blows per foot on the remaining 16 piles.

High resistances were experienced between elevations −58 and −64 and again between −72 and the maximum depth to which the piles were driven which in the main ranged from −81 to −88.

Very high resistances were experienced between elevations −59 and −61 where 94 of the 231 piles drove at rates in excess of 100 blows per foot. Of the 94, 39 drove in excess of 200 blows; of the 39, 27 in excess of 400 blows; of the 27, 10 in excess of 1,000 blows; and of the 10, one in excess of 3,000 blows per foot.

Very high resistances were also experienced between elevations −81 and −88, where 218 of the 231 piles needed 181 to 399 blows per foot; of the 218, 125 at some elevation or elevations required 400 or more blows per foot.

These figures are significant in that the number of blows forecast to be needed at maximum resistance after minimum penetration of 40 feet was, as noted above, 90 blows per foot.

Because of the high resistances encountered, it was decided that all piles that required more than 400 blows per foot would be extracted because of the possibility of damage. The extracted piles showed their tips to be shattered and their flanges split, torn, and twisted for varying distances of from one or two feet to eight or ten feet. In some instances five to seven feet of rock were embedded in the flanges of the extracted piles. In some instances the excessive driving caused the butts of piles to become battered to the extent that they had to be cut off to avoid wedging of the anvil of the hammer. This occurred notwithstanding the fact that the hammer was equipped with a driving cap which fitted over the butt of the pile.

A sample of the rock which came from about elevation −60 was extracted from one of the damaged piles and analyzed. It was found to have a compressive strength of 34,400 pounds per square inch which is *50 percent stronger than average granite.*

Minimum penetration of −88 was never attained and when all the piles were in place and accepted by the Government the average penetration was 35.5 feet below the bottom of the excavation at −46.6 with eight of the piles being only 26 to 29 feet below. The average overall penetration of the piles was −82 with the highest at −72.7 and the lowest at −88. The Government was aware that the piles rested at higher elevations than the contract called for when it accepted them and knew as well of the resistances encountered in driving at the various levels.

The above outline of the difficulties encountered by plaintiff, not the least of which is the number of blows of the hammer required in driving the H piles,

in excess of the maximum resistance expected of 90 blows per foot after –88 was reached, indicates without a doubt that it did experience changed conditions and that it was damaged as a result thereof.

The Government points out in its brief that the specifications included caveatory and exculpatory provisions which warned that the information and data furnished to bidders was not intended as representations or warranties but was furnished for information only and that any conclusions drawn by the contractor as to surface or subsurface materials to be encountered were at the contractor's risk. The Government also pointed out that the general conditions of the specifications provided for acknowledgment by the contractor that he had made a site investigation and included a disclaimer by the Government as to responsibility for any understanding or representation made by any of its officers or agents.

The implication is, of course, that because of these provisions the plaintiff should be denied recovery as it did not make and analyze borings of its own, and that those provisions hold the Government harmless for any inconsistencies between the results of the borings reported in the specifications and drawings and those conditions which actually were encountered.

█ █ It would have been a virtual impossibility, however, for any bidder to make its own borings, analyze them, compute, prepare, and submit its bid after the Invitation for Bids was first published since there was only a 40-day interval between that publication and the opening of the bids. There were 32 piers and two abutments to be constructed. Borings in two to four places would be necessary at each location, not only at Pier 1–N. Therefore, we hold that because of the inability of the plaintiff to bore, analyze the borings, and to compute, prepare, and submit its bid within the short time allotted, plaintiff is not bound by the caveatory and exculpatory provisions of the contract and specifica-

tions and, conversely, those provisions do not relieve the defendant of liability for changed conditions as the broad language thereof would seem to indicate. Plaintiff had a right to rely on the Government's specifications and drawings and the Government is bound by any assertions made therein notwithstanding the fact that it was stated that that data would be for information only. Moreover, this court has repeatedly held that the specifications cannot alter the effect of the specific language of the *Changed conditions* section of the contract. See Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551; Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 109 Ct. Cl. 517; Walsh Brothers v. United States, 69 F.Supp. 125, 107 Ct.Cl. 627; Hirsch v. United States, 94 Ct.Cl. 602.

█ We hold, therefore, that Article 4 of the contract entitled *Changed conditions* was not restricted in any sense by the language of the Invitation for Bids or the specifications paragraph SC–7d or paragraph GC–2 which attempt to relieve the Government of all liability if the subsurface conditions were not as reported. We further hold, that the conditions encountered by plaintiff were materially different from those reported by the specifications and that this is exactly the type of situation anticipated by the *Changed conditions* provision in the standard Government contract. Plaintiff should, therefore, be reimbursed to the extent that the changed conditions caused it to incur expenditures in excess of that which would have been incurred had the subsurface been as reported by the specifications.

Findings 29 and 30, 64, 79, and 85 through 91 outline in detail the additional costs incurred as a result of the changed conditions. Judgment will be entered in accordance with the computations therein in the amount of $50,414.-90.

█ The only problem remaining is whether plaintiff is entitled to the recovery of the liquidated damages in the amount of $10,000 which were assessed by defendant because of delay in the

overall completion of the contract. Plaintiff contends that the 110 days of additional work at Pier 1–N was responsible for it remaining on the project for an additional period of 65 days and that the court, therefore, should recognize the fact that the changed conditions caused the delay in the overall completion of the contract.

While there may be a direct relationship between the changed conditions which necessitated additional work at Pier 1–N and the delay in the overall completion of the contract, we cannot find that that is the case unless there is proof in support thereof, and there is none. While the record shows that plaintiff was delayed by changed conditions at Pier 1–N for a period of 30 calendar days in the driving of the sheet piles for the cofferdam, for 73 days in excavating for the pier base, and for 7 calendar days in the driving of the H piles, or a total of 110 calendar days, there is not sufficient evidence in the record to show that these delays caused an overall delay of the entire project. The only detailed evidence in the record concerns the pertinent operations at Pier 1–N, with only casual and superficial references to the other piers or to the project as a whole. Both parties deliberately endeavored to limit the evidence to Pier 1–N. We are unable, therefore, from the evidence before us to make a determination that the overall delay was caused by the changed conditions. Accordingly, plaintiff is not entitled to recover the liquidated damages assessed by defendant.

Judgment will be entered in favor of plaintiff in the amount of $50,414.90.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

### Findings of Fact.

* * * * * *

29. The hard materials encountered in driving the sheet piling are more fully described in later findings concerning excavation of the cofferdam and driving of the steel H piles for the pier foundation.

In driving the cofferdam sheeting, plaintiff encountered subsurface conditions materially different from those indicated by the contract drawings.

If conditions had been as represented, plaintiff could have set and driven 15 sheets per 8-hour shift and thus have taken 9 shifts to drive the 136 sheets that were placed. It was reasonably estimated by plaintiff that 5 shifts would be required to set the driving frame. A total of 14 shifts, or 18 calendar days, would have been required for the entire operation. This work actually was done over a period of 51 calendar days from February 19, 1947, through April 10, 1947, utilizing 43 shifts, of which 11 shifts were employed on the driving frame and miscellaneous matters, none of which were affected by changed subsurface conditions. The remaining 32 shifts were devoted to sticking and driving of sheeting, and the excess number of such shifts caused by the changed subsurface conditions amounted to 23.

30. Reasonable costs incurred by plaintiff on the sheeting and bracing operations amounted to $5,181.97 for labor for the 43 shifts and $5,660 for equipment use (including fuel) for the 51 calendar-day period, or total direct costs of $10,841.97.

These costs, being an average of $252.14 for each of the 43 shifts, amounted to a total of $5,799.22 for the 23 excess work shifts.

* * * * * *

64. If the subsurface conditions at Pier 1–N had been as shown on the contract borings, plaintiff could have excavated with the equipment available at the site 200 cubic yards per 8-hour shift, and on this basis, the excavation of the 3,800 cubic yards required for Pier 1–N would have been accomplished in 19 shifts, or about 25 calendar days on a single shift basis.

The actual time taken for the excavation work was May 7, 8, 9, and June 9 through September 11, 1947, a period of

98 calendar days, during which plaintiff employed a total of 105 shifts, or an excess of 86 shifts.

Reasonable costs incurred by plaintiff on the excavation operations amounted to $6,755.61 for labor for the 105 shifts, and $14,290 for equipment use (including fuel) for the 98 calendar-day period, or total direct costs of $21,045.61.

These costs, being an average of $200.43 for each of the 98 shifts, amounted to a total of $17,236.98 for the 86 excess work shifts.

\* \* \* \* \* \*

79. Had the subsurface conditions been as shown by the contract borings, plaintiff with the equipment which it had at the site, could have driven at least seven piles per 8-hour shift, and thus have driven all 231 piles in 33 8-hour shifts.

The actual time required was 48 calendar days during which plaintiff utilized 77 8-hour shifts, or an excess of 44 shifts required by the changed subsurface conditions encountered.

Reasonable costs incurred by plaintiff on the driving of the H piles amounted to $14,260.59 for labor for the 77 shifts. Heavy use of equipment was made during the 48 calendar-day period of these operations, and reasonable costs incurred by plaintiff for equipment use (including fuel) amounted to $17,255. These costs amounted to $31,515.59 for the 77 shifts.

With the average of such costs being $409.29 for each of the 77 shifts, the total reasonable amount of such costs for the excess 44 shifts amounted to $18,008.76.

Had the subsurface conditions been as represented, the pile driving would have been accomplished in 41 calendar days on a single shift basis, whereas actual operations extended over 48 calendar days with multiple shifts.

\* \* \* \* \* \*

85. Plaintiff contends that in addition to the excess costs which it incurred in direct connection with the construction of the cofferdam, excavation for the pier base, and driving of the H piles at Pier 1-N, it incurred additional costs of an indirect nature which it identified by name and amount as follows:

Additional Field Costs:
Field Office .................... $12,737.25
Batching plants .............. 38,584.05
                    $51,321.30
Employees Room and Board............... 805.00
Overhead Expense ......................... 21,202.35

   Total .............................. 73,328.65

86. In connection with the operation of the field office at the project, plaintiff had a superintendent and other straight time and regular employees who were paid on a weekly basis, such employees being required to remain assigned to the project as long as there was any work to be done. These employees were paid a total of $462 per week, on which payroll insurance at a rate of 9.96 percent, or $46.02 per week, was paid. Two of these employees, including the superintendent, received allowances for room and board amounting to a total of $66.25 per week.

Plaintiff necessarily maintained a job truck and a job boat at the project throughout the performance, at reasonable costs of $100 per week for the truck and $75 per week for the boat.

The total costs of these fixed items was $749.27 per week, or on the basis of a 5 work-day week, $149.85 per day.

87. The specifications contained the following provision with respect to batching and mixing of concrete:

"1-10 Batching and Mixing.-
a. *Equipment*.—The contractor shall provide at the site of the work two (2) or more modern and dependable batch-type mixing plants. The plants shall be so located and arranged that a minimum plant capacity of 1,000 cubic yards of concrete per 8 hours is made available and ready for use on the same side of the canal as the pier during the placing of each separate lift in either main pier base. (1N and 1S.) The remaining plant capacity shall be available for immediate use, if necessary, to maintain a continuous rate of pour of 85 cubic yards per hour. The available plant shall include not fewer than two (2) complete mixers with separate power

plants. The equipment shall be capable of combining the aggregate, cement, and water into a uniform mixture and of discharging this mixture without segregation.

* * * * * *

"(8) The mechanism for delivering water to the mixers shall be such that leakage will not occur when the valves are closed. * * *"

Plaintiff did not provide the batch-type mixing plants but instead two batching plants each possessing a capacity of 500 cubic yards per 8-hour day, one of which was located on the north side of the canal and the other on the south side of the canal. The batched aggregates were discharged into transit-mix trucks, and the concrete mixed on the way to the point of deposit. No objection was ever made by any representative of the defendant to the batching plants and concrete equipment employed by plaintiff, or the combined use of both plants for a pour on one side of the canal.

The largest continuous pours to be made under the contract were the two tremie pours for Piers 1–N and 1–S, each located at the bottom of the pier excavation about and just above the pile projections, and plaintiff by use of both batching plants during each operation succeeded in maintaining a continuous rate of pour of 85 cubic yards per hour, or 680 cubic yards per 8-hour shift. Except for these two tremie pours, each plant was used to service pours on the various piers and the abutment on the same side of the canal.

The average daily reasonable cost incurred by plaintiff on account of the two batching plants was $453.93.

88. In its claim for additional field costs, plaintiff combined the daily costs of field office expense and batching plants and arrived at a total daily cost of field expense of $603.78. Plaintiff applied this rate to 85 working days which it derived from 118 calendar days, the alleged total excess time required to perform the sheeting and bracing, the excavation and the H pile driving operations at Pier 1–N.

These claimed 118 calendar days occurred within the period February 20, 1947, to October 29, 1947, during which time work was being prosecuted throughout the entire project. The daily reports of the resident engineer show that during this time concrete pours were conducted on most of the piers of the project.

The evidence is not sufficient to support any finding that plaintiff's field costs for field office and batching plants were increased in the above-stated period because of changed conditions at Pier 1–N, or that such costs were increased by any overall delay in completion of the entire project, caused by such changed conditions at Pier 1–N.

89. During the course of the contract performance sufficient skilled labor in the immediate area was not available and plaintiff was required to recruit employees from New York and other areas and pay their room and board.

It is not shown in evidence that these employees were engaged to work solely at Pier 1–N, or that their period of employment was confined to the time when changed conditions were encountered there. It is established that during this period two of these employees were detained at Pier 1–N at times when they could have been assigned to other work.

The excess costs thus incurred by plaintiff by changed conditions at Pier 1–N on account of employees' board and room was the reasonable sum of $345.

90. The fairly allocated amount of plaintiff's general overhead on all of its business to the pertinent project was the sum of $5,395 per month. By applying this monthly sum to the claimed 118 calendar-day period, which is equivalent to 3.93 months, plaintiff requests the sum of $21,202.35 as general overhead cost.

These claimed 118 calendar days occurred when work was progressing on the whole project. No overall delay of the entire project is shown to have been caused by changed conditions at Pier 1–N.

A fair and reasonable allowance for general overhead expenses would be 10

percent of the total excess of direct costs caused by changed conditions encountered on the three pertinent phases of the work at Pier 1–N.

### Summary of Damages.

91. In the performance of the work required for the construction of Pier 1–N, plaintiff incurred reasonable excess costs caused by the above-described changed conditions, as follows:

| | |
|---|---|
| Sheeting and bracing | $5,799.22 |
| Excavation | 17,236.98 |
| Driving H piles | 18,008.76 |
| Employees room and board | 345.00 |
| | 41,389.96 |
| Overhead expenses at 10% | 4,139.00 |
| | 45,528.96 |

In the allowances of additional sums of money for changed conditions on other piers, defendant allowed 10 percent of the increased costs for profit, and on the costs summarized above, such allowance for profit would amount to $4,552.90 for a total sum of $50,081.86.

Plaintiff would be further obligated to pay an additional amount of premium to its bonding company for bonds furnished as required by the contract and specifications at a rate of .665 percent of the $50,081.86, or $333.04.

Total damages amount to $50,414.90.